IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 28, 2004

## GWYNNE T. BARTON, ET AL. v. ROY J. GILLELAND, ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 149678-1     Daryl R. Fansler, Chancellor**

---

**No. E2004-01369-COA-R3-CV   - FILED MARCH 30, 2005**

---

The limited partners ("the plaintiffs") of Henry Manor, Ltd., a Tennessee limited partnership ("the Partnership"), brought this declaratory judgment action against (1) Roy J. Gilleland and J. Cleve Smith, the Partnership's former administrative general partners, and (2) the trust created by the Partnership's former, and now-deceased, managing general partner, Glen R. Claiborne. The plaintiffs seek relief related to the Partnership's property, as well as an accounting and an order for distribution of proceeds. In 1992, Claiborne and his wife formed the G & P Claiborne Trust ("the Trust")[1], to which they transferred, among other assets, Claiborne's beneficial interest in the Partnership. Claiborne died in 1997. The apartment complex owned by the Partnership, which was its primary asset, was sold in 2000. Subsequently, Gilleland and Smith sought a percentage of the proceeds from the sale pursuant to the terms of the partnership agreement. The plaintiffs aver, among other things, (1) that Gilleland and Smith are not entitled to any of the proceeds from the 2000 sale, as they resigned from the partnership in 1982, and (2) that the Partnership was dissolved in 1992 when Claiborne transferred his interest to the Trust. The parties filed competing motions for summary judgment. The trial court held that Gilleland and Smith are entitled to share in the proceeds of the 2000 sale; that the Partnership did not dissolve until the death of Claiborne in 1997; and that the plaintiffs are not required to pay capital contributions that came due in 1983 and 1984. We agree with the trial court that Gilleland and Smith are entitled to share in the sale proceeds under the terms of the original partnership agreement. We further agree with the trial court that the Trust's claim against the plaintiffs for unpaid capital contributions is barred by the applicable statute of limitations. Although we disagree with the trial court's judgment that Claiborne did not violate the partnership agreement by transferring a part of his interest in the Partnership to the Trust in 1992, we hold that the transfer, while a violation of the agreement, does not constitute an event of dissolution. We affirm the trial court's judgment that the Partnership did not dissolve until 1997.

---

[1]Stanley C. Roy, one of the named defendants in this action, is the trustee for the Trust. We will refer to the G & P Claiborne Trust and Roy collectively as "the Trust" in discussing issues raised by them. When discussing issues related solely to Roy, we will refer to him by name.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and
SHARON G. LEE, JJ., joined.

Dudley W. Taylor, Knoxville, Tennessee, for the appellants, Gywnne T. Barton, W. Coleman Bryan,
Pat N. Fultz, Charles E. Jenkins, Howard F. Johnston, Dr. Lawrence Kennedy, Jr., Paul Ledbetter,
S. A. Mars, III, Irene S. Nevels, Ralph V. Norman, Jr., Cary T. Rodgers, Kenneth F. Scarbro, Lillian
Scarbro, W.F. Scarbro, Lane T. Shipley, Edgar H. Tenent, III, and Teresa S. Zohn.

Clark H. Tidwell, Nashville, Tennessee, for the appellees, Roy J. Gilleland and J. Cleve Smith.

David L. Buuck, Knoxville, Tennessee, for the appellees, G & P Claiborne Trust and Stanley C. Roy,
Trustee.

**OPINION**

I.

The Partnership was initially formed by agreement dated September 28, 1978. Its purpose
was to acquire, develop and manage a rent-subsidized apartment complex in Hamblen County to be
known as Henry Manor Apartments ("the Property"). The funds for acquiring and developing the
Property were provided by proceeds from the sale of a separate housing development and capital
contributions from the plaintiffs. The limited partners consisted of those who originally subscribed
for a limited partnership interest or subsequently acquired such an interest.

On February 26, 1979, the original partnership agreement was "restated" through a document
entitled the "First Amendment to Limited Partnership Agreement and Certificate of Limited
Partnership of Henry Manor, Ltd." ("the Restated Agreement"). The Restated Agreement contains
provisions relative to organization, contributions, management, and withdrawal or transfer of a
partnership interest. It provides that Claiborne would be the managing general partner, and that
Gilleland and Smith would serve as the administrative general partners for the first three years the
Property was available for occupancy. The agreement also amended the allocation of initial capital
contributions such that Claiborne held 0.98%, Gilleland and Smith each held 0.1%, and Donald L.
Jackson[2], the trustee for the plaintiffs – limited partners – held 99%. As compensation for their
services, Gilleland and Smith were entitled to a "[l]iquidation or refinancing fee" in "20% of the net
proceeds from any sale or refinancing of the project, less the balance of his capital account as
increased by 8% simple interest from the date of the receipt of the 100% Occupancy Permit and final

---

[2]Donald L. Jackson, a named defendant in this action, filed a motion to dismiss on March 9, 2001. The
disposition of that motion, however, is unclear. No brief was filed on his behalf, and he is not referenced in any of the
parties' briefs.

HUD closing." Smith was to receive two-ninths of this fee, while Gilleland was to receive seven-ninths. Claiborne, as managing general partner, was entitled to "20% of the proceeds from any refinancing or sale of all or part of the project proceeds or condemnation awards." The agreement also limited Claiborne by precluding him from "sell[ing] or transfer[ing] all or any part of his interest" without the written consent of limited partners holding over 50% interest in the Partnership.

On the same date that the Restated Agreement was executed, Claiborne, Smith, Gilleland, Jackson and Roy V. Hopkins[3] executed a separate agreement ("the Companion Agreement"), which set forth the "rights, duties and obligations concerning their Partnership interests and compensation for past and future services." Claiborne, Smith and Gilleland executed a third document entitled "Mutual Indemnity Agreement."

In 1982, a new agreement ("the 1982 Agreement") entitled "Supplemental and Amended Agreement as between the remaining parties to the February 26, 1979 Agreement" was entered into by Claiborne, Smith, Gilleland, and Jackson. The 1982 Agreement provides that the Companion Agreement "incorrectly defines certain of the rights, duties and obligations" of the parties. The 1982 agreement further provides that Gilleland and Smith would resign as administrative general partners in exchange for the partners releasing them from all claims. It also provides that the Partnership would pay Gilleland and Smith $83,000 in satisfaction of the service fees due them under the applicable provision of the Companion Agreement. The 1982 Agreement stemmed from Gilleland mis-characterizing some of the payments he received, as a result of which the Partnership incurred additional assessments of federal income tax and interest.

On March 8, 1983, the Partnership brought suit against Gilleland and Smith in which it sought, among other things, a reformation of paragraph one of the 1982 agreement. The subject paragraph one provides that

> [t]he parties agree that all monies heretofore paid and the monies referred to in the following paragraph 2 paid contemporaneously with the execution of this instrument to Smith and Gilleland by Henry Manor have been and are in exchange for the reduction of the respective interests of Smith and Gilleland in the Partnership and not otherwise, but in no way does this instrument diminish the present and remaining interests of Smith and Gilleland in the Partnership.

In particular, the Partnership averred that paragraph one contained a benefit for Gilleland and Smith not intended by the partners. Following a bench trial, the trial court found in favor of the Partnership, holding that Gilleland breached his duty by reporting monies as capital gains instead of ordinary income, which breach jeopardized the tax advantages otherwise accruing to the Partnership. The trial court ordered that paragraph one of the 1982 Agreement be "struck from said

---

[3]By the Companion Agreement, Roy V. Hopkins relinquished his 10% interest in the Partnership in consideration of $10.00, the receipt and legal sufficiency of which he acknowledged.

Agreement and held for naught." Subsequently, the parties entered in a settlement on December 14, 1989, by the terms of which Gilleland, "in consideration of the premises and the payment of [$88,500]," was released from further claims and the case was dismissed. Gilleland and Smith were thereafter not involved in the Partnership.

Claiborne continued to serve as the managing general partner. By instrument dated January 1, 1992, Claiborne and his wife created the G & P Claiborne Trust ("the Trust"). Stanely C. Roy was designated as trustee. Claiborne was a contingent lifetime beneficiary of the Trust. The Trust instrument transferred several of Claiborne's assets to the Trust, *including* Claiborne's interest in the Partnership. The Trust instrument, however, contains a caveat which provides that "[i]f any partnership interest cannot be transferred to this Trust by reason of partnership contract, law, or otherwise, then the Grantor does hereby assign any proceeds, income, residuary or otherwise to the end that this Trust shall be the beneficial owner." As previously noted, the Restated Agreement provides that Claiborne, as the managing general partner, could not sell or transfer "all or any part of his interest" in the Partnership, except with the written consent of limited partners having a total interest in capital in excess of 50% of the total. No such consent was ever obtained.

Following the execution of the Trust, Claiborne continued acting as managing general partner. On September 19, 1994, a certificate of limited partnership filed with the Secretary of State and in the Register's Office for Hamblen County was signed by Claiborne as the general partner.

Claiborne died on December 18, 1997. Following Claiborne's death, Roy, as trustee, undertook certain actions regarding the Partnership, including the negotiation of the sale of the Property. He also filed tax returns for the Partnership. The plaintiffs executed documents that authorized Roy to sign all sale documents. The Property was sold on November 15, 2000. As of November 14, 2002, the proceeds from the sale were held in escrow by Roy and Dudley W. Taylor, the attorney for the plaintiffs. Financial statements of the Partnership indicate that Claiborne and/or his successors were due $47,887 for unpaid capital contributions, and that the plaintiffs had failed to pay capital contributions in 1983 and 1984.

The plaintiffs filed the present complaint for declaratory judgment against Gilleland, Smith, the Trust, Roy and Jackson, in which they averred, among other things, as follows: (1) that the Partnership dissolved in 1992 following Claiborne's transfer of his interest in the Partnership to the Trust; (2) that as a result of that act of dissolution, the plaintiffs and the Trust thereafter owned the Property as tenants-in-common; (3) that Gilleland and Smith are not entitled to any percentage of the net proceeds from the sale of the Property; (4) that neither Roy nor the Trust is entitled to proceeds from the sale of the Property; (5) that the plaintiffs are not indebted to the Partnership; (6) that to the extent that Roy and/or the Trust charged management fees to the Partnership following its dissolution, those fees were inappropriately charged and should be repaid; and (7) that attorney's fees incurred in the sale and for the bringing of this suit should be paid from proceeds of the sale and other funds under Roy's control.

In their amended answer, Gilleland and Smith contended that the 1982 Agreement did not change their entitlement under the Restated Agreement and the Companion Agreement. They also raised the following affirmative defenses: (1) that they had a contractual right to receive fees which they relinquished for a percentage of the net proceeds of the sale; (2) that they never relinquished their interest in the Partnership and were entitled to the percentage share of the sale; (3) that the plaintiffs are estopped from denying Gilleland and Smith's right to a percentage of the net proceeds since the plaintiffs filed tax returns as partners, consistent with the Partnership accountings, which reflected such entitlements; (4) that since the plaintiffs argue that the Partnership was dissolved in 1992, they are barred under the doctrine of laches from denying Gilleland and Smith their entitlement; and (5) that, similarly, they are barred from denying Gilleland and Smith their entitlement under the doctrine of waiver.

By an amended answer filed March 9, 2001, the Trust raised the affirmative defenses of waiver, estoppel and laches. In addition, they brought a counterclaim in which they alleged (1) that each individual limited partner is obligated to the Partnership in the amount of $6,800; (2) that the managing general partner is entitled to the amount of $47,887 pursuant to the compensation scheme in the Restated Agreement; and (3) that the Trust is also entitled to 20% of the net proceeds of the sale.

The plaintiffs moved for partial summary judgment; each of the defendants responded by filing a motion for summary judgment. At the urging of the trial court, which found there to be little dispute relative to the facts, the parties filed a joint stipulation of facts. However, as the parties were unable to agree on certain stipulations proffered by the plaintiffs, the parties took the deposition of Roy to be tendered as proof. In any event, all of the parties now treat the facts as undisputed; following their lead, we will do the same since we do not perceive any dispute as to the material facts.

After receiving oral argument on the competing motions, the trial court filed its memorandum opinion. In its opinion, the trial court held (1) that Gilleland and Smith were collectively entitled to 20% of the net proceeds from the sale of the Property; (2) that the Partnership was not dissolved in 1992 when Claiborne transferred his interest in the Partnership to the Trust; and (3) that the plaintiffs were not obligated to make capital contributions for the years 1983 and 1984, as any claim for those contributions was barred by the applicable statute of limitations.

Both sides moved to amend the findings and conclusions of the trial court, which motions were first heard on December 16, 2003. At that hearing, the trial court affirmed its earlier decision, although it also held that the Partnership dissolved in 1997 when Claiborne passed away and no

substitute or successor general partner was appointed. Following the receipt of argument on March 14, 2004, on a variety of motions[4], the trial court filed its final judgment on May 17, 2004, in which it held: (1) that Gilleland and Smith were collectively entitled to 20% of the net proceeds from the sale of the Property; (2) that the transfer of Claiborne's interest to the Trust was limited to the assignment of his beneficial interest, and therefore did not prompt the Partnership's dissolution by operation of law; (3) that the Trust is entitled to 20% of the net proceeds from the sale; (4) that the failure to appoint a substitute or successor general partner following Claiborne's death in 1997 led to the dissolution of the Partnership; (5) that the plaintiffs are not obligated to make capital contributions for the years 1983 and 1984, as such claims are barred by the statute of limitations; (6) that the amount of $47,887 on the Partnership books as a debt owing to Claiborne and the Trust is not charged to the plaintiffs' share of liquidating distribution since that debt was only to be paid from capital contributions; and (7) that the Trust's motion to implead the State of Tennessee and the accounting firm of Coulter & Justus should be denied. From this order, the plaintiffs appeal.

## II.

The plaintiffs take the following positions on appeal: (1) that Gilleland and Smith are not entitled to receive any of the proceeds from the sale of the Property; (2) that the Partnership dissolved in 1992 when Claiborne transferred an interest in the Partnership to the Trust; (3) that following the dissolution of the Partnership, the plaintiffs and the Trust held the Property as tenants in common; (4) that the Trust was not entitled to a percentage of the proceeds from the sale; and (5) that no management fees should have been charged to the Partnership following Claiborne's transfer of his interest, or, alternatively, following his death.[5]

In addition to countering the plaintiffs' arguments, the Trust challenges the trial court's judgment by taking the following positions: (1) that the Trust's claim to unpaid capital contributions is not barred by the statute of limitations; (2) that the Trust is entitled to the $47,887 owing on the Partnership books; and (3) that it is entitled to attorney's fees.

## III.

As this case involves a grant of summary judgment, we must decide anew "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Since a motion for summary judgment presents a pure question of law, our review is *de novo* with no presumption of correctness as to the

---

[4]The Trust filed a motion to join, as third-party defendants, the State of Tennessee and the accounting firm of Coulter & Justus, P.C. This motion was denied. As it is not argued that the trial court erred in denying this motion, we will not address it here.

[5]The plaintiffs also raise allegations that Claiborne breached his fiduciary duty to the Partnership. However, as this issue was not raised below, it cannot be raised for the first time on appeal. *See Tamco Supply v. Pollard*, 37 S.W.3d 905, 909 (Tenn. Ct. App. 2000).

trial court's judgment. *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993).

Since this is fundamentally a contract action, we must adhere to the cardinal rule in contract interpretation – that a court must seek to "ascertain the intent of the parties." *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002). Initially, a court must determine whether the contract is ambiguous. *Planters Gin Co. v. Fed'l Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). If the contract is plain and unambiguous, its meaning is a question of law and it is incumbent upon the court to interpret it as written according to its plain terms. *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999). A contract's language must be taken in its plain, ordinary, and popular sense, and the words expressing the parties' intention must be given their "usual, natural, and ordinary meaning." *Id.* (citations omitted). However, if a contract is deemed ambiguous, the court must apply established rules of construction to gauge the parties' intent. *Planters Gin Co.*, 78 S.W.3d at 890. Different interpretations of a contract do not render it ambiguous. *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Systems, Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994). However, if it is "of uncertain meaning and may fairly be understood in more ways than one," it is ambiguous. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). As further guidance in gauging intent, the law provides that a court may consider the acts and declarations of the parties, for "[i]f the conduct of the parties subsequent to a manifestation of intention indicates that all of the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation." *Hamblen Co. v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983)(quoting Restatement (First) of Contracts, § 235 (1932)).

In the context of a limited partnership, the written contract of the parties controls, as "[t]he duties and obligations of partners arising from an actual partnership relation . . . are regulated by the express contract as far as they are touched thereby." *Young v. Cooper*, 203 S.W.2d 376, 385 (Tenn. Ct. App. 1947)(quoting 40 Am.Jur. 140 *Partnership*, § 20). However, "[w]here the express contract does not cover situations or questions which arise, they are determined under the Uniform Partnership Law which is in force in this state." *Id.*

IV.

In light of the foregoing principles, we direct our attention to the plaintiffs' first contention, *i.e.*, that Gilleland and Smith are not entitled to share in the net proceeds from the sale of the Property. The plaintiffs contend that the trial court erred in awarding 20% of the net proceeds to Gilleland and Smith who, following their resignation in 1982, no longer provided any services to the Partnership.

The Companion Agreement establishes the following with respect to Gilleland and Smith's compensation:

2.   Under the terms of the bond indenture, Morristown Housing Development Corporation is issuing first-lien revenue bonds in the amount of [$1,390,000].  Under the terms thereof, the Partnership is entitled to the sum of $47,800 for general requirements and builder's overhead, and the sum of $122,033 for builder and sponsor risk and profit to which Smith would be entitled to two-ninths and Gilleland to seven-ninths, or the total of these sums when the funds are available.  *In consideration of relinquishing their respective interests in the original Limited Partnership Agreement from twenty percent (20%) and seventy percent (70%) respectively to .01 per cent* [sic] *each, the Partnership agrees to credit Smith's capital account in the amount of $37,740.66 and Gilleland's capital account in the amount of $132,092.34, and agrees to pay each these amounts, plus interest at the rate of eight percent (8%) per annum from the first proceeds of any sale or refinancing of the project.  Provided, however, payment of such capital and interest shall not exceed twenty percent (20%) of the total net proceeds from any such sale or refinancing.   The Partnership agrees to sell or refinance the property on or before one year after the bonds become callable at par on December 1, 1999.*

3.  It is acknowledged by the parties and the Partnership that Smith and Gilleland have expended great amounts of time and considerable expense in organizing the Partnership; Gilleland having begun work on the project in 1975 and Smith having begun work on the project in 1977.  In recognition of these past services rendered . . . it is agreed that the Partnership shall pay Smith and Gilleland the sum of $25,000 each.  The Partnership and parties hereto also acknowledge that Smith and Gilleland have and will render valuable service to the Partnership relating to the construction of the apartment project, and it is hereby agreed that each shall be paid the sum of $25,000 as development fees.  The combined fees as set forth in this section shall be paid as follows: $40,000 upon the admission of new Limited Partners to the Partnership in accordance with the subscription Agreement . . . or on September 1, 1979, whichever first occurs; $14,000 upon completion of the construction and acceptance thereof by the Partnership as approved by HUD, which is expected to be in June, 1980; $14,000 one year thereafter; $27,000 two years thereafter; and $5,000 three years thereafter.

(Emphasis added).  Subsequently, in 1982, the parties amended the Companion Agreement by the 1982 Agreement, which provides, in relevant part, as follows:

-8-

1. The parties agree that all monies heretofore paid and the monies referred to in the following paragraph 2 paid contemporaneously with the execution of this instrument to Smith and Gilleland by Henry Manor have been and are in exchange for the reduction of the respective interests of Smith and Gilleland in the Partnership and not otherwise, but in no way does this instrument diminish the present and remaining interests of Smith and Gilleland in the Partnership.

2. Henry Manor shall pay to Smith and Gilleland the sum of [$83,000] in full and complete satisfaction of any obligation to make further payments as referred to in paragraph 3 of the [Companion Agreement] and to this extent Smith and Gilleland do hereby release, remise and discharge Henry Manor, Claiborne and Jackson from the same.

In the judgment rendered in the 1983 suit against Gilleland and Smith, the court struck paragraph one of the 1982 Agreement. However, the other provisions remained in full force and effect. In light of the language contained in these agreements, the trial court in the instant case held

it is clear that Paragraph 3 of [the 1979 Agreement] addresses payment for services and Paragraph 2 creates a distinct obligation which is not addressed in [the 1982 Agreement] since the paragraph that arguably addressed extinguishment of that obligation was stricken. . . .Without the language in Paragraph 1, [the 1982 Agreement] only purports to satisfy the partnership's obligation for payment of the $100,000 to Gilliland [sic] and Smith for services.

* * *

The original [1982 Agreement], prior to Paragraph 1 being struck by order of the court, indicated an intent to preserve the "present and remaining interest" of Smith and Gilliland [sic]. Therefore, nothing in [the 1982 Agreement] could be construed as an attempt by the partnership to remove Smith and Gilliland [sic] as general partners in accordance with the partnership agreement or pursuant to Tenn. Code Ann. § 61-2-402.

In short, it would appear that there are no documents indicating that Smith and Gilliland [sic] have withdrawn from the partnership as general partners or that the partnership somehow has satisfied the obligations existing under the [Restated Agreement] or the Companion Agreement . . . for the payment of the twenty percent (20%) of the net proceeds of the sale of the [Property]. Accordingly,

the Court finds that they are entitled to the said twenty percent (20%) according to their respective interests.

The plaintiffs proffer several arguments as to why the trial court erred in its judgment. First, they refer us to the Revised Uniform Limited Partnership Act ("RULPA"), codified in Tenn. Code Ann. § 61-2-101, *et seq.* (2002). The plaintiffs contend that under Tenn. Code Ann. § 61-2-602 (2002), a general partner may withdraw at any time following written notice to the other partners. Subsequent to that withdrawal, that partner is

> entitled to receive any distribution to which he is entitled under the partnership agreement and, if not otherwise provided in the partnership agreement, he is entitled to receive, within a reasonable time after withdrawal, the fair value of his interest in the limited partnership as of the date of withdrawal based upon his right to share in distributions from the limited partnership.

Tenn. Code Ann. § 61-2-604 (2002). The plaintiffs contend that the 1982 Agreement contains no provisions relative to the distribution to administrative general partners following their withdrawal. Consequently, according to the plaintiffs, Gilleland and Smith should be furnished the fair value of their interest in the Partnership. As the plaintiffs characterize the $83,000 paid to Gilleland and Smith under paragraph two of the 1982 Agreement as the fair value of their respective interests, according to the plaintiffs' theory, they are not entitled to anything more.

We do not find the plaintiffs' argument to be persuasive, and hold that Gilleland and Smith are collectively entitled to 20% of the net proceeds from the sale. The 1982 Agreement provided for payments to be furnished to Gilleland and Smith in consideration for various *service fees* to which they were entitled under paragraph three of the Companion Agreement. The 1982 Agreement did not, however, purport to amend or alter *other* amounts to which Gilleland and Smith were entitled.

The plaintiffs attempt to characterize Gilleland and Smith as creditors, which would only entitle them to a distribution of what was available at the time of their resignation. *See* Tenn. Code Ann. § 61-2-606 (2002)[6]. However, we agree with Gilleland and Smith that even if they were creditors, they did not become so until after the sale of the Property. Gilleland and Smith have a contractual right under the Restated and Companion Agreements that has not been amended and is not contingent upon their continued involvement with the Partnership. In fact, the Companion Agreement only contemplates that they remain involved for the first three years during which the Property would be available for occupancy by tenants. Their service obligation was not to extend beyond this point. The Companion Agreement further provides, however, that the Partnership was not due to sell the Property until one year after the bonds became callable in December, 1999. The

---

[6]Tenn. Code Ann. § 61-2-606 provides, in relevant part, that "[u]nless otherwise provided in the partnership agreement, at the time a partner becomes entitled to receive a distribution, he has the status of, and is entitled to all remedies available to, a creditor of the limited partnership with respect to the distribution."

-10-

lapse in time does not remove their entitlement, but rather is contemplated by the Companion Agreement.

The plaintiffs also argue that the "capital accounts" referred to in paragraph two of the Companion Agreement are "fictional" because those accounts do not comport with any legally accepted definition of the capital of a partnership. However, the language of the agreement controls. *See Young*, 203 S.W.2d at 385. The plaintiffs accepted the Companion Agreement through their trustee, Donald Jackson.[7]

V.

We now direct our discussion to the issues pertaining to the Trust. The plaintiffs' second issue concerns Claiborne's transfer of his interest to the Trust by instrument dated January 1, 1992. The Restated Agreement provides that

> [t]he Managing General Partner may not sell or transfer all or any part of his interest in the Partnership, except with the written consent of Limited Partners having a total interest in capital in excess of fifty (50%) per cent of the total interest in capital of all Limited Partners.

Claiborne never obtained any written consent to transfer his interest. Consequently, the plaintiffs argue that he effectively withdrew from the Partnership by transferring his interest.

A general partner may assign his interest in whole or in part without dissolving the partnership, "[u]nless otherwise provided in the partnership agreement." Tenn. Code Ann. § 61-2-702(a) (2002). It is obvious that the language of the Restated Agreement limited Claiborne's right to transfer his interest. However, the trial court relied on a "caveat" contained in the Trust instrument to hold that Claiborne did not, in fact, transfer his interest in violation of the Restated Agreement. The Trust instrument provides as follows:

> THE FOLLOWING ASSETS, along with the valuation of each, are hereby transferred to this Trust:
>
> * * *
>
> Glen Claiborne's interest in the following General or Limited Partnerships:

---

[7]The plaintiffs proffer that during the pendency of the 1983 suit, which stemmed from Gilleland playing a role in putting at risk the tax benefits to which the investors were promised, Gilleland's attorney wrote a letter making certain statements relative to Gilleland relinquishing his interest in the Partnership. This letter, however, was never admitted into evidence and was excluded from the joint stipulation of facts. Consequently, the contents of this letter are not properly before us and have no bearing on our holding.

-11-

(c)  Henry Manor, Ltd., Morristown, Tennessee; Value $80,000.

*If any partnership interest cannot be transferred to this Trust by reason of partnership contract, law, or otherwise, then the Grantor does hereby assign any proceeds, income, residuary or otherwise to the end that this Trust shall be the beneficial owner.*

(Emphasis added).  The trial court held that the language of the Restated Agreement  "triggers the caveat in the trust agreement resulting in only an assignment of Claiborne's beneficial interest at the time of the execution of the trust agreement."  In its final judgment, the trial court held that the Partnership dissolved in 1997 upon the death of Claiborne, as no substitute or successor general partner was appointed.

We disagree with the trial court's holding that the transfer in the Trust instrument is not in violation of the Restated Agreement.  The Trust instrument states that all of Claiborne's interest is transferred to the Trust.  Yet, as a default, *i.e.* in the case of a transfer in violation of a partnership contract  – as is clearly the case here – the Trust instrument purports to "assign any proceeds, income, residuary or otherwise to the end that this Trust shall be the beneficial owner."  We hold that the language of the Restated Agreement prohibiting a transfer of "all *or any part* of his interest in the Partnership," being expansive in nature, prohibits the default transfer of the "proceeds, income, residuary or otherwise," *i.e.*, the beneficial interest in the Partnership.  (Emphasis added).  The RULPA defines "Partnership interest" as "a partner's share of the profits and losses of a limited partnership and the right to receive distribution of partnership assets."  Tenn. Code Ann. § 61-2-101(12) (2002).  When the default provision of the Trust was triggered, Claiborne transferred a "part of his interest" and hence violated the Restated Agreement.  We must now examine whether this transfer caused a dissolution of the Partnership.  In its opinion, the trial court noted that "[t]he Restated Agreement does not make assignment an event of dissolution and Claiborne would have ceased to be a partner under § 61-2-70[2](a)(4) only in the event that all of his partnership interest was assigned."  We focus on the Restated Agreement to determine if Claiborne's default transfer constitutes an "event of dissolution."

The Restated Agreement sets forth the following provisions relative to the dissolution of the Partnership:

> If the Managing General Partner becomes incapacitated, withdraws, or becomes bankrupt, the Partnership shall dissolve.  The Partnership shall thereafter conduct only activities necessary to wind up its affairs, unless within ninety (90) days after one of the listed events all the Partners elect in writing to continue the Partnership.  If an election to continue the Partnership is made, then
>
> (a) A successor Managing General Partner shall be selected. . . .

The Restated Agreement prohibits the transfer of Claiborne's interest, in whole or in part, yet it is silent as to the *effect* of such a transfer if made without proper consent. Significantly, the agreement does not expressly state that an assignment constitutes a withdrawal such that the dissolution process is triggered.

Where a partnership operates under a written contract, "the duties and obligations of partners . . . are regulated by the express contract as far as they are touched thereby." ***Young***, 203 S.W.2d at 385. However, where the partnership agreement fails to cover questions which arise, as in the instant case, those answers are determined under the relevant statutory scheme. ***Id.*** Since the Restated Agreement fails to address the effect of the general partner transferring, without consent, his interest, or a part thereof, we must turn to the statutory provisions for an answer.

Tenn. Code Ann. § 61-2-702(a) (2002), which concerns the assignment of Partnership interests, provides as follows:

> (a) Unless otherwise provided in the partnership agreement:
> (1) A partnership interest is assignable in whole or in part;
> (2) *An assignment of a partnership interest does not dissolve a limited partnership or entitle the assignee to become or to exercise any rights or powers of a partner*;
> (3) An assignment entitles the assignee to receive, to the extent assigned, only the distribution to which the assignor would be entitled; and
> (4) A partner ceases to be a partner and to have the power to exercise any rights or powers of a partner upon assignment of all of his partnership interest.

(Emphasis added). As previously noted by us, the Restated Agreement expressly provides that Claiborne may not transfer all or part of his interest in the Partnership without the consent of at least 50% of the Partnership interests. It is silent as to the effect of that transfer. The applicable statute, Tenn. Code Ann. § 61-2-702(a)(2), however, clearly states that, unless otherwise provided, an assignment of a partnership interest does *not* dissolve a partnership. As there is no language in the Restated Agreement that provides otherwise, we find that the assignment, while in breach of the Restated Agreement, did not result in the Partnership's dissolution.

The plaintiffs argue that the transfer is an event of dissolution since Claiborne withdrew as managing general partner by transferring his interest. It is true that when a general partner transfers *all* of his partnership interest, he ceases to be a partner and to have the rights of a partner. *See* Tenn. Code Ann. § 61-2-702(a)(4). However, we do not find that Claiborne transferred *all* of his partnership interest to the Trust. Rather, he transferred "any proceeds, income, residuary or otherwise to the end that this Trust shall be the beneficial owner." Since there is nothing in the Restated Agreement that equates transferring a part of his interest with withdrawal, the plaintiffs' argument must fail. We also note that there is clear evidence of Claiborne's continued involvement

-13-

in the Partnership. For example, the Certificate of Limited Partnership filed in 1994 is signed by Claiborne in his capacity as the managing general partner.

Tenn. Code Ann. § 61-2-702(a)(2) states that an assignment of a partnership interest does not dissolve a partnership. As there is no language in the Restated Agreement that provides otherwise, we find that the assignment, while in breach of the Restated Agreement, did not result in the Partnership's dissolution. Although our reasoning differs from that of the trial court, we are at liberty to affirm the lower court's judgment even if we rely upon different reasoning to do so. *See Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986).

Although not dispositive, we find further support for our conclusion in the parties' conduct following Claiborne's partial transfer of his interest. In interpreting a contract, it is appropriate, as a rule of practical construction, to consider the interpretation of a contract as evidenced by the parties' conduct and declarations. *See Hamblen Co.*, 656 S.W.2d at 335. Following the conveyance to the Trust, the Partnership continued to exist. Roy and Claiborne's wife both signed the Partnership tax returns. Following Claiborne's death, none of the plaintiffs moved to appoint a successor managing general partner under the procedures set forth in the Restated Agreement. Roy communicated directly with the plaintiffs in 1999, representing himself as the managing general partner of the Partnership, and the plaintiffs signed consent agreements to permit Roy to handle the sale of the Property. It is clear that, even after the transfer to the Trust, the parties treated Claiborne as a member of the Partnership.

VI.

In their third issue, the plaintiffs argue that once the Partnership dissolved and no successor general partner was designated, the Property was thereafter held by the plaintiffs and the Trust as tenants-in-common. In support of this contention, the plaintiffs cite two decisions of this court in which, following a *judicial* dissolution, we adjudged that the partners held the partnership property as tenants in common. *See W & F Land Co. v. Cherokee Place*, No. 03A01-9511-CH-00395, 1996 WL 718468, at *9 (Tenn. Ct. App. E.S., filed December 13, 1996); *Koksal v. Hurt*, 1987 WL 17991, at 7 (Tenn. Ct. App. E.S., filed October 7, 1987).

The instant case, however, does not involve a judicial dissolution. As the trial court noted from the bench during the March 15, 2004, hearing, the Partnership is in the "winding up stage with nobody . . . legally charged with winding up." Therefore, as provided by the Restated Agreement,

> [i]n the event of a voluntary dissolution or the death, incapacity, withdrawal, or bankruptcy of the Managing General Partner which is not followed by the exercise of the election of the Partners to continue the Partnership pursuant to [the Restated Agreement], the Partnership shall immediately commence to wind up its affairs. *The Partners shall continue to share profits and losses during liquidation in the same proportions as before dissolution.*

-14-

(Emphasis added). This court has held that "[u]ntil termination of the partnership the interests of the partners in partnership assets, profits, liabilities and losses do not change, even though they exist at or occur after dissolution." *Shepherd v. Griffin*, 776 S.W.2d 119, 122 (Tenn. Ct. App. 1989). We therefore hold that the rights of the partners have not been altered by the dissolution of the Partnership in 1997.

VII.

The plaintiffs argue that the Trust is not entitled to 20% of the proceeds from the sale of the Property under the Restated Agreement. As support for this argument, they raise several arguments as to the fairness of permitting the Trust, while the Partnership was functioning without a managing general partner, to accumulate investor service fees in addition to this percentage of the sale. Additionally, they argue that where a partner has not performed obligations imposed by the partnership agreement, he cannot enforce any rights accruing to him, citing *Marble Co. v. Ripley*, 77 U.S. 339, 357-58 (1870). However, we find that the Trust's entitlement to this amount is contractual and, in the absence of any grounds for denying the Trust that entitlement, we decline to accept the plaintiffs' argument on this point.

VIII.

Lastly, the plaintiffs contend that they should be permitted to recoup management fees, or, investor service fees, paid beyond the dissolution of the Partnership.[8] Paragraph 6.2 of the Restated Agreement provides that the managing general partner is entitled to the following compensation:

> (a) Financial consulting and legal fees and expense reimbursement $151,000.00, payable from capital contributions from Limited Partners in the amounts and on the dates as set forth in the subscription agreements as follows: $22,800; $49,200; $35,400; $6,200 and $37,900.

> (b) Investor Service Fee $6,000 annually for the first five years beginning in June of 1980 and 5% of the gross annual rentals thereafter, payable only out of positive cash flow of the Partnership.

> (c) Liquidation or refinancing fee: 20% of the proceeds from any refinancing or sale of all or part of the project proceeds or condemnation awards.

The plaintiffs contend that the "Investor Service Fee" continued to be paid in substantial amounts following Claiborne's death. However, so the argument goes, they should not have been paid

---

[8]The plaintiffs originally proffered that these payments should not have been made after 1992 since, as they argued, the Partnership dissolved at that time. Following the dissolution, so their argument goes, there was no managing general partner. However, as we have determined that the Partnership did not, in fact, dissolve in 1992, we will only address this issue as it pertains to payments following the Partnership's dissolution in 1997 after Claiborne's death.

-15-

following the dissolution of the Partnership as the fee was only paid out "of positive cash flow of the Partnership." If the Partnership no longer existed, there could no longer be any positive cash flow from which these fees could be paid.

The plaintiffs do not question Claiborne's right to receive these fees prior to the dissolution of the Partnership. Therefore, the question becomes whether Roy, as the Trustee, was entitled to receive these amounts following Claiborne's death if he was not appointed successor general partner.

In a hearing on motions to amend the findings and conclusions, the trial court phrased the issue as "whether the trust was entitled to continue to receive payments subsequent to Mr. Claiborne's death and whether the plaintiffs may recover those payments." The trial court stated the following:

> The compensation for the managing general partner, Mr. Claiborne, consisted of three areas; first, the financial consulting and legal fees and expense reimbursement; the second was the investor service fees which were to be paid annually; and third, the liquidation refinancing fee consisting of 20 percent of the proceeds from any refinancing or sale of all or part of the project proceeds or any condemnation awards. These fees were not in the nature of distributions of property. They were instead agreed-upon amounts of compensation to be paid from identifiable sources of revenue.
>
> [Tenn. Code Ann. §] 61-2-705 provides that in a case of a deceased partner the partners' executor . . . or other legal representative may exercise all of the partners' rights for the purpose of settling his estate or administering his property. Section 8.1 of this agreement provides that in the event of a voluntary dissolution or the death or incapacity, withdrawal or bankruptcy of the managing general partner, the partner shall continue to share profits or losses during a liquidation in the same proportions as before dissolution.
>
> * * *
>
> . . . the court feels that these fees were, in effect, returns on his investment and payments for the risk he assumed as a general partner. Accordingly, the court finds that these contractual obligations survived the death of Mr. Claiborne and that the payments were appropriately made to the trust as . . . his beneficial interest at that time.

We agree with the trial court that the Trust was entitled to receive these fees following Claiborne's death. It is a contractual right, and the plaintiffs have not cited any authority that would suggest this right does not survive Claiborne's death through the "winding up" process.

-16-

The plaintiffs further argue that these fees were not earned because neither Claiborne nor Roy ever performed any management services. An apartment management company handled the leasing and collecting of rents, and the auditing, accounting, and preparation of tax returns was performed by an independent accounting firm. These companies were paid from rental revenues realized from the Property. However, the receipt of the subject fees was not made contingent upon these services being actually performed by the named individuals. Claiborne, and later Roy, were responsible for seeing that the various services were performed and there is no proof showing the services were not performed by the named individuals or others retained by them. This issue is found adverse to the plaintiffs.

IX.

We now direct our attention to those issues raised by the Trust. First, the Trust challenges the trial court's judgment that the plaintiffs were not required to pay unpaid capital contributions from 1983 and 1984, which totaled $81,600. In rendering its opinion, the trial court cited Tenn. Code Ann. § 61-2-502 (2002), which provides, in relevant part, as follows:

> (a) Except as provided in the partnership agreement, a partner is obligated to the limited partnership to perform any promise to contribute cash or property or to perform services, even if he is unable to perform because of death, disability or any other reason. If a partner does not make the required contribution of property or services, he is obligated at the option of the limited partnership to contribute cash equal to that portion of the agreed value (as stated in the records of the limited partnership) of the contribution that has not been made. The foregoing option shall be in addition to, and not in lieu of, any other rights, including the right to specific performance, that the limited partnership may have against such partner under the partnership agreement or applicable law.
>
> * * *
>
> (c) A partnership agreement may provide that the interest of any partner who fails to make any contribution that he is obligated to make shall be subject to specified penalties for, or specified consequences of, such failure. Such penalty or consequence may take the form of:
>
> (1) Reducing or eliminating the defaulting partner's proportionate interest in the limited partnership;
>
> (2) Subordinating his partnership interest to that of nondefaulting partners;

(3) A forced sale of his partnership interest;

(4) Forfeiture of his partnership interest;

(5) The lending by other partners of the amount necessary to meet his commitment;

(6) A fixing of the value of his partnership interest by appraisal or by formula and redemption or sale of his partnership interest at such value; or

(7) Other penalty or consequence.

The trial court held that since the Restated Agreement was silent as to penalties or consequences for failure to make contractual contributions,

> [t]he question then turns to whether the partnership is barred from now pursuing any action against the partners to collect on the defaulted contributions. Plaintiffs urge that the statute of limitations has expired. [Section] 502 provides the partnership with certain options under paragraph (a) and provides for certain penalties and consequences under paragraph (c). Otherwise, it would appear that the partnership's remedies are limited to specific performance or "applicable law".
>
> Clearly, plaintiffs defaulted on any obligation to make contributions no later than 1984. The partnership's right to seek specific performance or other remedies available to it under applicable law accrued at that time. Plaintiffs' argument that the statute of limitations bars any action at this time is well taken.

The Trust argues that the trial court's application of the six-year statute of limitations, codified in Tenn. Code Ann. § 28-3-109 (2000), was in error. Instead, they contend that the plaintiffs were obligated to make the payments under Tenn. Code Ann. § 61-2-502, and that the only defense to non-payment is compromise by all the partners. Further, the financial statements furnished to the plaintiffs indicated that these amounts were outstanding and, consequently, remained an asset of the Partnership. The Trust argues that the plaintiffs' representations to regulatory authorities had the effect of ratifying that this amount was due and owing to the Partnership.

We find, however, that there is no reason why the six-year statute of limitations should not apply to the case before us. The statute of limitations on "actions for contracts not otherwise expressly provided for" is six years. Tenn. Code Ann. § 28-3-109(a)(3). In a breach of contract action, the statute commences to run as of the date of the breach or when one party announces its intention not to perform. *Greene v. THGC, Inc.*, 915 S.W.2d 809, 810 (Tenn. Ct. App. 1995). As

-18-

the plaintiffs neglected to pay these amounts in 1983 and 1984, the managing general partner had notice that the contributions were not furnished at the time they were due. Consequently, there is no reason why the applicable statute of limitations should not apply.

## X.

The Trust also argues that it is entitled to fees totaling $47,887, which amount was carried on the Partnership books as debt owing to Claiborne and the Trust. As discussed herein, the managing general partner was entitled to "[f]inancial consulting and legal fees and expense reimbursement [sic] $151,000.00, payable from capital contributions from Limited Partners."

From the bench, the trial court stated that

> [s]ince these payments to Mr. Claiborne . . . were restricted to funds from capital contributions, then it follows that there are no capital contributions from which to pay Mr. Claiborne this anticipated compensation. And even though the partnership carried it as a debt, there is no source from which to satisfy that debt, because these payments were restricted to the capital contributions which [sic] not made and cannot now be collected.

As we have held that the plaintiffs are not required to pay the capital contributions owing from 1983 and 1984, we decline to award to the Trust these fees, the source of which would be those capital contributions.

## XI.

Lastly, the Trust challenges the trial court's judgment that since this action was essentially between the partners, each party should pay its own attorney's fees. The Trust contends that the plaintiffs acquiesced in Roy's actions of signing federal income tax returns as general partner and executing the sale. The Trust contends that this activity on the part of the plaintiffs is inconsistent with its attack on the Partnership's existence by alluding to events in 1992. If the Trust failed to defend against this attack, so the argument goes, it would have negated the warranties made by Roy that this was a partnership and resulted in filings with HUD and the IRS being false. Consequently, the Trust contends it had no choice but to defend this action.

The American Rule, which provides that litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise, is followed in Tennessee. ***State v. Brown & Williamson Tobacco Corp.,*** 18 S.W.3d 186, 194 (Tenn. 2000). "The allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." ***Aaron v. Aaron,*** 909 S.W.2d 408, 411 (Tenn. 1995). We do not find that the trial court erred in declining to award attorney's fees to the Trust.

XII.

      The judgment of the trial court is affirmed and this matter is remanded to the trial court for enforcement of its judgment and collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed against the appellants.

_____
CHARLES D. SUSANO, JR., JUDGE